**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| THE CHILDREN'S HOSPITAL OF PHILADELPHIA,<br><br>*Plaintiff,*<br><br>v.<br><br>ORPHION THERAPEUTICS, INC.,<br><br>*Defendant.* | Civil Action No. 2:25-cv-3095-JFM |

**JOINT RULE 26(f) REPORT**

Pursuant to Rule 26(f) and Judge Murphy's policies and procedures, the parties have thoroughly discussed a discovery plan and provide the following report:

**I.    Counsel**

**A.**    Lead counsel for plaintiff(s):    John V. Gorman

B.    Lead counsel for defendant(s):    Noah Schwartz

C.    All counsel who participated in Rule 26(f) conference on behalf of Plaintiff(s):

John V. Gorman

Bradie Williams

D.    All counsel who participated in Rule 26(f) conference on behalf of Defendant(s):

Noah Schwartz

**II.    Description of claims and defenses**

The parties may assume that Judge Murphy has read the complaint and other pleadings and is familiar with the claims and defenses. With that in mind, counsel should go a layer deeper and summarize the key facts and threshold legal issues that underlie the claims and defenses. In addition, the parties should attach critical documents to this report, if not attached to the

1

pleadings already (e.g., in a contract case, the document(s) comprising the contract; in a personal injury case, photographs of the scene, etc.).

Plaintiff Description: Between 2019 and 2020, Plaintiff The Children's Hospital of Philadelphia ("CHOP") and Defendant Orphion Therapeutics, Inc. ("Orphion") entered into four agreements. These agreements relate to Orphion's purported desire to commercialize aspects of CHOP's groundbreaking gene therapies for certain central nervous system diseases, including CHOP's treatment for lysomal storage disease with AAV2-TPP1 and CHOP's treatment for MPSIIIa disorder. The parties' agreements include:

- An October 28, 2019 Exclusive Patent License (attached to D.I. 13 at pp. 55-91) ("License Agreement") under which CHOP granted Orphion an exclusive license under certain patents and technologies, in exchange for, *inter alia,* Orphion's promise to develop multiple clinical programs for commercial purposes. The agreement identified specific milestones that Orphion needed to achieve by specific dates. *See, e.g., id.* at pp. 86-87. The agreement also required Orphion to pay CHOP for expenses associated with the prosecution and maintenance of the licensed patents. *Id.* at ¶¶ 7.5, 7.6.
- A September 11, 2020 Vector Purchase Agreement (attached to D.I. 13 at 93-107) ("Purchase Agreement") which set fort the terms and conditions of Orphion's purchase of the available portions of a specific lot of AAV2-CAG-TPP1, which was viral vector materials that had been previously made by CHOP's Clinical Vector Core in compliance with current Good Manufacturing Practices ("cGMP"). (A viral vector is a modified virus that delivers genetic material to cells.)
- An October 13, 2020 Sponsored Research Agreement (attached to D.I. 13 at pp. 119-131) ("SRA") under which Orphion agreed to pay for CHOP's research relating to nonclinical animal studies involving AAV2-TPP1. No specific research results were guaranteed as a result of the sponsored research project.
- A December 13, 2020 Research Service Agreement (attached to D.I. 13 at pp. 133-149) ("RSA") under which CHOP's Clinical Vector Core provided Orphion with research grade, non-cGMP of AAV2-TPP1 viral vector for use in non-human, non-clinical studies. CHOP provided the subject materials "as is," and Orphion promised to pay CHOP for the materials.

By June of 2023, Orphion was a failed company. Orphion had not advanced its clinical programs, and had missed the milestones for multiple programs under the License Agreement by years. It had failed to make payments under every one of its agreements with CHOP, *e.g.,* it had not paid patent expenses under the License Agreement, paid CHOP only a fraction (about 27%) of the purchase price under the Purchase Agreement, and had not made all payments owed under the SRA or RSA. Further, Orphion did not have enough cash to proceed to advance its programs. According to Orphion, it needed $3-5 million to bring its program to the clinical

2

stage, but an institutional investor had defaulted on a $5 million investment commitment. According to Orphion, it needed 90 vials of AAV2-TPP1 vector in the short term – *i.e.*, approximately $143k worth of material – even before it got to the clinical stage. Orphion pled with CHOP to make an "in-kind" investment in Orphion by, *inter alia*, donating vials of the material that was the subject of Purchase Agreement, with the explicit hope that CHOP's donation would result in investment by third parties. Amidst Orphion's various pleas for investment, CHOP emailed Orphion on June 1, 2023 email to tell Orphion that it would consider making an investment as part of a series investment with other investors, but expressed concern that, without other investors committed, Orphion's program would not progress. CHOP also informed Orphion that only 125 vials of the vector material were available to Orphion, and that if Orphion ever needed more, it should reach out to CHOP's Clinical Vector Core to plan for additional manufacturing of the vector material.

Soon thereafter, in June 2023, CHOP sent a letter notifying Orphion of its breach of the License Agreement due to its failure to meet clinical program milestones and pay owed patent expenses. Orphion never cured these breaches, and the License Agreement was terminated in September 2023. In August 2023, CHOP notified Orphion of its breach of the Purchase Agreement, under which Orphion had failed to make payment for years, and the Purchase Agreement was terminated in September 2023. In November 2023, CHOP gave Orphion notice of its breach of the RSA for failure to pay, and the agreement was terminated February 2, 2024. Orphion also failed to pay all money owed CHOP under the SRA.

In October 2024, Orphion initiated an action in the Supreme Court of New York against CHOP and other third parties (the "New York Action"). (A copy of the original complaint in the New York action is attached at D.I. 13 at pp. 17-117). There, Orphion alleged that CHOP's June 1, 2023 email constituted breach of the Purchase Agreement and fraud. Orphion also alleged that CHOP committed conversion by providing the material of the Purchase Agreement to a third party (Latus Bio Inc. ("Latus"). Orphion also alleged that CHOP's purported breach of the Purchase Agreement caused Orphion to breach the License Agreement, and that CHOP's termination of the License Agreement constituted a breach of the License Agreement. Finally, Orphion alleged that CHOP breached the License Agreement by disclosing to Latus information about CHOP's AAV2-TPP1 vector material that was the subject of the Purchase Agreement.

CHOP moved to dismiss Orphion's claims in the New York action because, *inter alia*, the action, and each of the claims, involve the Purchase Agreement, and under the terms of the Purchase Agreement's forum selection clause, must be brought in a Philadelphia court. The New York Court granted Orphion leave to file an amended complaint, and gave Orphion direction that claims against CHOP arising out of the Purchase Agreement should proceed in Pennsylvania. Orphion subsequently filed an amended pleading in the New York Action that asserts claims for breach of the License Agreement and for breach of the implied warranty of good faith and fair dealing in the License Agreement, but that does not assert claims for breach of the Purchase Agreement, for fraud, or for conversion.

CHOP initiated this action in June 2023, and filed an amended complaint in August 2023 asserting various claims, and Orphion has asserted four counterclaims in response.  The various claims and counterclaims can be categorized as follows:

- CHOP's Performance Under The Purchase Agreement: CHOP Counts I & II seek judicial declaration that CHOP has not breached the Purchase Agreement, and that it has satisfied all of its obligations under the Purchase Agreement and with respect to the vector materials of the Purchase Agreement.  Orphion asserts a counterclaim (Count I) for breach of the Purchase Agreement.  Threshold legal issues involve the interpretation of the provisions of the Purchase Agreement.  The key facts relating to these claims involve Orphion's failure to pay – for years -- the Purchase Price for the materials, and CHOP's June 1, 2023 statement regarding the current and future availability of AAV2-TPP1 vector materials.

- Fraud/Negligent Misrepresentation: CHOP Count III seeks judicial declaration that CHOP is not liable for fraud.  Orphion asserts counterclaims for fraud (Count III) and Negligent Misrepresentation (Count IV).  These counts relate to Orphion's assertion that CHOP's June 1, 2023 statements about the Purchase Agreement material were misstatements on which Orphion relied to its detriment.  Threshold legal issues include whether Orphion's tort claims are barred by the "gist of the action" doctrine, whether Orphion's claims fail for lack of a misrepresentation, and whether Orphion's alleged damages resulting from its purported inability to use the materials of the Purchase Agreement are barred by the Purchase Agreement's limitation of liability provision.  Key factual issues involve Orphion's purported reliance on CHOP's alleged misstatement, and whether CHOP's alleged misstatement caused Orphion's alleged harm (alleged to be over $650 million) or whether Orphion's own failures (including its failure to timely advance its clinical programs, and its inability to raise sufficient capital to continue its operations) caused the alleged harm
.

- Orphion's Performance Under The Purchase Agreement, SRA and RSA:  In Count V, CHOP alleges that Orphion has breached its obligations under the parties' Purchase Agreement, SRA and RSA.  Threshold legal issues include the interpretation of the parties' agreements.  Key factual issues involve Orphion's improper assertion of claims in New York under the Purchase Agreement, and Orphion's failure to pay monies owned under the agreements.

- No Conversion:  CHOP Count IV seeks judicial declaration that CHOP is not liable for conversion.  Orphion has not asserted a counterclaim relating to this issue, despite having previously asserted such a claim in the New York Action.  Threshold legal issues involve the interpretation of the Purchase Agreement.  Key fact issues involve whether, as

Orphion has accused, CHOP delivered the material of the Purchase Agreement to Latus. (It did not).

- CHOP's Performance Under the SRA: Orphion Counterclaims II alleges that CHOP breached the SRA. Legal issues for this claim involve interpretation of the agreement. Fact issues involve CHOP's performance under the agreement.

Defendant Description: This case is about Plaintiff-Counterclaim Defendant The Children's Hospital of Philadelphia ("CHOP") abusing its power and putting a small pharmaceutical startup, Defendant-Counterclaim Plaintiff Orphion Therapeutics, Inc. ("Orphion") out of business so CHOP could provide Orphion's patent rights and specialized materials to a competing company, Latus Bio, Inc. ("Latus"), founded by CHOP officers and in which CHOP was a syndicate investor. This was pure abuse by a large research institution for financial gain.

Defendant-Counterclaim Plaintiff Orphion Therapeutics, Inc. ("Orphion") purchased 416 vials of specialized Viral Vector SPK-1002 (AAV-TPP1; Lot A2FP1-A1804C-C) (the "Vector Materials") manufactured by CHOP on September 11, 2020. As CHOP knew, Orphion needed the Vector Materials to conduct clinical trial for its planned therapeutic to treat Late Infantile Neuronal Ceroid Lipofuscinosis Disease ("CLN2 Disease"). Under the Purchase Agreement, CHOP was obligated to store the Vector Materials for Orphion and deliver them upon request. (Purchase Agreement §§1.1, 3.1.) Payment for the Vector Materials was to be made in installments. (*Id*. §§3.1, 4.1, 4.2, Schedule 1.) Orphion made two payments under the Purchase Agreement, and Orphion was not obligated to make any other payments until the Vector Materials passed certain testing milestones. (*Id*.) CHOP does not dispute that the Vector Materials never passed these testing milestones. Therefore, it is indisputable that Orphion was not obligated to make any other payments under the Purchase Agreement.

Nevertheless, on June 1, 2023, after Orphion informed CHOP that it would shortly need delivery of the Vector Materials to begin clinical trials for its CLN2 treatment, CHOP—the person of Zev Sunleaf ("Sunleaf") told Orphion that it only had "125 vials of clinical TPP1 … available. We no longer have the 400 vials from 3 years ago." CHOP, thereby openly declared its breach of the Purchase Agreement. Prior to its current litigation-driven position, CHOP did not attempt to defend this breach by claiming Orphion owed money under the Purchase Agreement because Orphion did not owe any such money. CHOP just breached the Purchase Agreement.

In response to CHOP's declaration of a breach, on June 1, 2023, Orphion wrote to CHOP that "we need to have conversation around this information ASAP." (Ex. A, hereto, at 3.) Orphion further wrote that it "had requested the GMP material be preserved on storage for our use with plans for clinical trial in 2023. At no time did we receive any further communication from the Vector Core [at CHOP] around this material nor did we provide any instructions for them to destroy or diver this material." (*Id*.) Sunleaf responded that he was reaching out to a few people at CHOP to see who should be on the call. (*Id*.)

But for days Sunleaf did not get back to Orphion.  Orphion kept requesting this urgent call including to discuss how long it would take CHOP to manufacture more Vector Material, but CHOP kept stalling. Until June 8, 2023, when CHOP responded with a letter purporting to terminate a different agreement, the Exclusive Patent License (the "License Agreement") under which CHOP had granted Orphion an exclusive license—even as to CHOP—for certain intellectual property ("IP") to all Orphion to commercialize certain patents and technologies related to treatment of various central nervous system diseases ("CNS"), first and foremost, Late Infantile Neuronal Ceroid Lipofuscinosis Disease (also known as Neuronal Ceroid Lipofuscinosis Type 2 Disease) ("CLN2 Disease").  The June 8 letter was plainly pretextual and an attempt by CHOP to deflect from their gross breach of the Purchase Agreement.

On June 14, 2023, Orphion sent a formal letter, through counsel, to CHOP, demanding that CHOP explain what happened to the Vector Materials as there was "no provision in the Purchase Agreement that allows CHOP to unilaterally destroy or sell the Material to another party." (Ex. B, hereto, at 1.)  In particular, Orphion demanded that "CHOP provide all information related to the 400 vials of Material" including "(1) what happened to those vials; (2) when; (3) who was responsible for the action and who approved … (5) why CHOP did not notify Orphion until June 1, 2023 of the missing 400 vials; …" (*Id.* at 2.)  CHOP ignored the Demand Letter and provided no explanation for what happened to the vials. CHOP certainly did not claim that the vials still existed or respond by saying that CHOP was not providing the Vector Materials because the Orphion did make payments under the Purchase Agreement.

Moreover, CHOP later admitted (in a 2025 communication with counsel) that Sunleaf's claim in the June 1, 2023 was false. CHOP still had all the remaining vials at the time and could have delivered them as requested by Orphion.  But by making Orphion believe that the Vector Materials had been destroyed or sold, CHOP fraudulently induced Orphion into not suing for specific performance that Orphion believed was impossible.  Instead, Orphion had to discontinue its development of its CLN2 treatment and went out of business.  CHOP, thereby, committed fraud, or, at the very least, negligent misrepresentation.

Two months later, CHOP sent a letter to Orphion purporting to terminate the Purchase Agreement that they had already materially breached.  This purported termination was a further breach of the Purchase Agreement, which does not contain a termination provision.  Incredibly, CHOP's purported grounds for terminating the Purchase Agreement was Orphion's failure to fully pay for the Vector Materials that CHOP had previously told Orphion it no longer had.

The reason for CHOP's breach only became clear in May 2024 when CHOP's officer, Beverly Davidson ("Davison") announced that she had founded a company, Latus, that was developing its own CLN2 treatment and CHOP had joined as a syndicate investor.  The implication was clear, Davidson/Latus needed the IP from the License Agreement and the Vector Materials from the Purchase Agreement. Even if it meant breaching CHOP's agreements with Orphion and lying about the availability of the Vector Materials.

In October of 2024, Orphion sued CHOP in the Supreme Court of New York (the "New York Action") pursuant to the mandatory exclusive forum selection clause in the License Agreement (the "Forum Selection Clause").  Orphion believed that the Forum Selection Clause—which made New York the "exclusive venue" with "exclusive jurisdiction" for "[a]ll disputes between the Parties"—governed all of its claims against CHOP.  (Answer, Ex. 1 §15.5.)

However, the New York court held that the Forum Selection Clause only governed claims under the License Agreement, and required Orphion's claims for breach of the Purchase Agreement and fraud, as to the Vector Materials to proceed in Philadelphia. Orphion has filed a notice of appeal for this decision. Orphion's appellate brief on this matter is due to be filed in November 2025.

CHOP then beat Orphion to the courthouse and filed this action seeking declaratory judgments that it is not guilty of breach of the Purchase Agreement and fraud/negligent misrepresentation as to the existence and availability of the Vector Materials as of June 1, 2023. As explained above and in the Counterclaims, CHOP is guilty of all of those things. CHOP also brought claims against Orphion for breach of the Purchase Agreement and two other ancillary agreements: the Sponsored Research Agreement ("SRA") and the Research Services Agreement (the "Non-cGMP Agreement"). Each of these is baseless.

*First*, Orphion did not breach the Purchase Agreement because it correctly interpreted the License Agreement as requiring all disputes between the Parties to be heard exclusively in New York.  Moreover, CHOP was not damaged by defending the action in a different forum.

*Second*, Orphion did not breach the SRA. CHOP never completed the work required by the SRA and, therefore, Orphion was not obligated to make the final payment that was due upon completion. On the contrary, it was CHOP that breached the SRA by failing to properly collect data and complete the research project as required.  Therefore, Orphion brought a counterclaim against CHOP for breach of the SRA.

*Third*, Orphion did not breach the Non-cGMP Agreement. Orphion made the full-required payment of $167,492 under the Non-cGMP Agreement. And CHOP does not explain what money owed under that agreement it believes was unpaid.

CHOP also brought a declaratory judgment claim that it was not guilty of Conversion. Conversion was included in the original New York Action because, at the time, CHOP had not yet conceded that it was lying in June 2023 when it claimed that it no longer had all the vials of Vector Materials. If CHOP was telling the truth in June 2023 when it said it no longer had the vials, it would be guilty of conversion for having used or transferred Orphion's vials.

**III.    Stipulated facts and insurance coverage and deductibles**

The parties must stipulate as to facts not in dispute. We require stipulations to avoid

duplicative and unnecessary discovery, wasted time in depositions asking questions about names,

addresses and background or otherwise on dates which are undisputed, employment histories,

etc. While we do not expect you to stipulate to disputed facts at this early stage, we do expect a

thorough recitation of undisputed facts. The parties must also disclose insurance coverage,

including retainer or deductible, consistent with Rule 26(a)(1)(A).

Stipulated Facts:

1. CHOP and Orphion entered into an agreement entitled "The Children's Hospital of Philadelphia Patent License Agreement-Exclusive" on October 28, 2019.

2. CHOP and Orphion entered into an agreement entitled "Vector Purchase Agreement" on September 11, 2022.

3. CHOP and Orphion entered into an agreement entitled "Sponsored Research Agreement" on October 13, 2020.

4. CHOP and Orphion entered into an agreement entitled "Research Services Agreement" on December 13, 2020.

Insurance Coverage:  For CHOP, no insurance company has accepted a claim for CHOP's liability in this action.  For Orphion, no insurance company has accepted a claim for Orphion's liability in this action.

**IV.    Anticipated scope of discovery**

This information is critical to having a meaningful conference, and Judge Murphy's

understanding of the scope and nature of discovery will largely determine the schedule. The

parties should consider the discovery that they will need and provide thoughtful answers.

Generic statements like "discovery about all claims and defenses" is unacceptable. Judge

Murphy invites the parties to vary from the default limits in the Federal Rules and provide

thoughtful answers based on their actual assessment of the case.

A.    Summarize with specificity those issues on which the parties will need to conduct discovery. Identify categories of information each party needs in discovery and why.

Plaintiff:  Plaintiff will need discovery on at least the following categories of information:

- Documents and information relating to Orphion's negotiation of the parties' agreements, and Orphion's performance and failure to perform thereunder.  This discovery would include documents constituting or reflecting Orphion's internal communications and/or communications with third parties (such as investors and potential investors) regarding the negotiation of the parties' agreements, regarding Orphion's performance or nonperformance under the agreements, and regarding Orphion's interactions with CHOP during the performance of the agreements. This information is necessary because it provides information to support CHOP's claims for breach of contract (including Orphion's knowledge that it was in breach of agreements), to defend against Orphion's claims for breach of contract (because it will show Orphion's own non-performance under the Purchase Agreement and SRA), and to defend against Orphion's damages claims by showing that Orphion's own failure to perform under the agreements was a direct and intervening cause of Orphion's alleged harm in this case.

- Documents and information relating to Orphion's operations, and in particular, Orphion's failure to advance its gene therapy programs.  This would include documents relating to Orphion's purported development of a subretinal gene therapy for pediatric use that produces the TPP1 protein (such as preclinical study work, study design and protocol preparation, work in preparing an IND, work preparing for clinical trials, etc.).  It would also include similar documents relating to Orphion's development (if any) of gene therapy programs identified in the parties' License Agreement (for MPS IIIa or TPP1 CNS Programs).  This information is necessary to defend against Orphion's damages claims.  Orphion claims that CHOP's June 1, 2023 statement, and Orphion's inability to use the Purchase Materials caused Orphion to cease operations; relatedly, Orphion alleges in this action (*e.g.,* D.I. 14, p. 25, ¶ 68) that CHOP's performance under the Purchase Agreement led to the termination the License Agreement.  The requested information will show that it was Orphion's own commercial failures, and its own failures to timely develop its gene therapy programs, caused the harm that it now alleges was caused by CHOP.

- Documents and information regarding third party manufacturing of vector material.  Such documents include internal Orphion documents recognizing the existence of third parties capable of manufacturing vector material such as AAV2-CAG-TPP1, and documents reflecting or constituting communications with third parties about such third party manufacturing availability and capacity.  This information is necessary to defend against Orphion's damages claims, and to demonstrate that Orphion failed to mitigate its purported damages arising from an ability to use the specific materials of the Purchase Agreement.

- Documents and information relating to the financial operations of, investment in, and investment promotion activities of Orphion.  Such documents include Orphion's financial

statements, investment presentations, forecasts, projections, budgets, documents constituting or reflecting internal communications and communications with third parties about Orphion's financing, financial operations, cash positions, notes, series investing, burn rate, etc.  This information is necessary to defend against Orphion's damages claims by showing that harm that Orphion alleges was caused by CHOP was actually caused by Orphion's own poor financial management and financial position.

Defendant:    Discovery requests have been served in the companion matter captioned *Orphion Therapeutics, Inc. v. The Children's Hospital of Philadelphia, et al.*, Index No. 655222/2024 (Supreme Court of New York) and Orphion intends on seeking similar discovery here without the need for unnecessary duplicative efforts. Categories of information sought include:

- CHOP documents and information related to the negotiation, performance and breach of the relevant agreements
- CHOP documents and information related to development, marketing, manufacture and licensing of the Vector Materials;
- CHOP documents and information related to its relationship with Latus, Sunleaf, Davidson (and third party documents related to the same);
- CHOP documents and information relation to its use/transfer of the Vector Materials
- CHOP documents and materials related development of CLN2 treatments;
- CHOP documents and information related to investment in CLN2 treatments.

B.    Anticipated number of interrogatories per party:

Plaintiff:    25

Defendant:    25

**C.**    Anticipated number of depositions per party:

Plaintiff:    10

Defendant:    10

D.    Do the parties anticipate the need for any agreements on remote deposition protocols?

The parties agree that a party may, but is not required to, depose a witness by remote means.  The parties agree that, in the event that a party wishes to depose a witness remotely, the parties will meet and confer in order to reach an agreement on protocols that will ensure that the witness does not communicate with anyone during the deposition other than participants in the deposition through the medium used to conduct the deposition (except for defending counsel to confer with the deponent to confer on whether to assert a privilege or on how to comply with a court order), and to ensure that the witness does not review information during the deposition other than information provided to him through the medium used to conduct the deposition.  In the event the

parties cannot reach agreement, the parties will present their dispute to the Court pursuant to its Policies and Procedures for discovery disputes.

E.      To the extent either party proposes to exceed the presumptive limits in the Federal Rules for discovery, explain the basis for that proposal.

Not applicable.

F.      Do the parties anticipate the need for a Fed. R. Evid. 502(d) order?

Yes.  The parties expect to incorporate relevant language in the proposed protective order.

G.      Do the parties anticipate the need for any third-party discovery? If so, identify the likely third parties and the discovery to be sought.

Plaintiff: Yes.  Plaintiff intends to seek documents and testimony from Orphion's former employees, its investors, and its potential investors regarding Orphion's relationship with CHOP, Orphion's purported development of gene therapies using CHOP's technologies, and Orphion's financial condition.

Defendant: Yes. Orphion intends to seek discovery from Latus and any brokers or investment advisors, who solicited CHOP's investment in Latus or advised CHOP to invest in Latus. Orphion also may seek documents and testimony from CHOP's former employees and investment representatives.

H.      Do the parties anticipate the need for experts? If so, identify the subjects on which the expert(s) may opine. Be sure to point out whether defendant(s) will be advancing experts on affirmative issues, or only in response to plaintiff(s) experts. State whether expert depositions will be taken, and if so, an agreement or positions on how many will be required.

Plaintiff:      Yes.  Plaintiff currently anticipates that it may introduce expert testimony on the following subjects: (a) the development and FDA approval process for gene therapies, (b) the market in which companies developing gene therapies operate, including the market for investment in such companies since 2020; (c) the technology involved with the AAV-CAG-TPP1 viral vector and with CHOP's relevant intellectual property; (d) the proper measure of damages in this case.  Plaintiff expects to advance experts on affirmative issues and in response to Defendant's experts.

Defendant:      Yes.  Orphion currently anticipates that it may introduce expert testimony on the same issues listed by CHOP—and in response to CHOP's experts—as well as (a) Latus' competing CLN2 therapeutic; (b) the irreplaceability of the Vector Materials; (c) the industry standards and timelines for the development of new therapeutics; and (d) Orphion's value prior to CHOP's bad acts.

The parties agree that each person disclosed by a party in this action pursuant to F.R.Civ.P. 26(a)(2)(A) will be made available for deposition once between the close of fact discovery and the close of expert discovery.

**I.**     Does the plaintiff expect to request attorneys' fees as a prevailing party, either pursuant to a contract or a statute? If so, state the basis for the expected request.

Plaintiff:     Not at this time.

Defendant:     Not at this time.

**J.**     Has each party provided written notice to the client of the obligation to preserve all relevant material, including electronic records?

Plaintiff:     Yes

Defendant:     Yes.

## V.     Status of discovery

The parties must summarize the status of discovery so far. If discovery has not progressed, the parties should explain why. In general, Judge Murphy expects the parties to begin discovery prior to the Rule 16 conference.

Plaintiff:     Plaintiff has propounded document requests and interrogatories upon Defendant.

Defendant:     Orphion has not yet propounded discovery requests on CHOP in this action. However, Orphion has propounded discovery requests in the New York action and anticipates substantial overlap.

## VI.     Proposed case management deadlines

A.     Rule 26(a)(1) initial disclosures were exchanged: Plaintiff: 9/8/2025; Defendant: 9/15/25

B.     Deadline to amend pleadings to add claims or parties (must be as early as practicable to avoid prejudice or unnecessary delays): November 15, 2025

C.     Deadline for affirmative expert reports (if any) and disclosure of lay witness opinion testimony with related information and documents (if any):  April 24, 2026

D.     Deadline for rebuttal expert reports (if any): May 29, 2026

E.     Deadline(s) to complete fact/expert discovery: Fact: March 26, 2026; Expert: June 26, 2026

F.      Provide an explanation for the position of the parties on whether expert discovery will run concurrently with fact discovery or be sequenced after fact discovery. Sequenced discovery will allow experts to provide Rule 26(a)(2) disclosures based on the entire factual record developed during discovery.

G.      If any party seeks more than 120 days for discovery, explain why.  This case involves complex factual and legal issues requiring involved fact and expert discovery.  It will also involve discovery of multiple third parties.  The parties are also involved in discovery in a related action between them in New York state court, with related fact discovery; the parties here propose that this federal action proceed on the same discovery schedule to avoid duplicative discovery and case inefficiencies.

H.      Deadline to file motion for summary judgment: August 14, 2026

## VII.   Electronic discovery

The parties' Rule 26(f) discussions must include a thorough discussion about electronic discovery, including but not limited to: (1) the need for electronically stored information ("ESI"); (2) sources of ESI; (3) the anticipated scope of electronic discovery; (4) the identity of potential custodians; (5) whether search terms will be necessary and, if so, any limitations thereto; (6) the respective burdens of collecting, reviewing, and producing ESI, including any claims for cost-shifting under the Federal Rules of Civil Procedure; and (7) any anticipated problems with electronic discovery. The parties should summarize their discussion on these issues here.

Counsel who attends the Rule 16 conference should be familiar with and able to discuss any ESI-related issues that might arise.

In addition, the Parties should state whether they have agreed to an ESI stipulation. If so, the parties should submit the stipulation to the Court in advance of the Rule 16 conference. If not, the parties should identify what issues need to be resolved to finalize the stipulation.

The parties Rule 26(f) discussion acknowledged the extensive discussions that the parties have already conducted regarding electronic discovery in connection with a related action between them in New York.  The parties have not agreed to any cost shifting, and have reserved the right to seek cost-shifting in the future. The parties have agreed to a detailed ESI stipulation in the New York action, and are in the process of incorporating the terms of that stipulation into one for entry in this federal action.

**VIII.  Protective orders and confidentiality agreements**

The parties should indicate whether they anticipate the need for a protective order in this

case. If so, the parties must explain what type of information needs protection from disclosure

and why such protection is warranted under governing standards. In addition, the parties are

directed to Judge Murphy's policies and procedures concerning protective orders and

confidentiality agreements.

The parties anticipate the need for a two-tiered protective order in this case.  The parties
expect to exchange commercially sensitive information regarding the parties' operations,
research and development, interactions with third parties under confidential agreements, and
financial positions.  The Court in the related New York action has ordered a two-tiered protective
order to govern information exchanged in that action, and the parties have submitted such a
stipulated order to the Court (attached here as Exhibit 1) which the parties generally envision
would also be exchanged in this federal action

**IX.    Alternative dispute resolution**

A.    Have the parties engaged in any settlement discussions? If so, set forth the status
of those negotiations. If not, explain why not.

The parties have engaged in settlement discussion through counsel.  The discussions have
not resulted in a resolution of the parties dispute, and the parties are proceeding forward with
litigation.

B.    Have the parties explored or considered other forms of alternative dispute
resolution? If so, summarize those efforts. If not, state the parties' positions with
respect to ADR, as required under Local Rule 53.3.

The parties have discussed the use of an ADR process at an appropriate stage in the
litigation.  The parties do not believe that the parties are presently at a stage where use of an
ADR process would be productive.

C.    Identify the individual who will attend the Rule 16 conference who will have
authority to discuss settlement.

Plaintiff:    John V. Gorman

Defendant:    Noah A. Schwartz

**X.     Consent to send case to a Magistrate Judge**

If all parties consent to have a United States Magistrate Judge conduct any or all

proceedings in this case, pursuant to 28 U.S.C. § 636(c), the parties should indicate as such and complete and return to the Court a Consent and Reference Of A Civil Action To A Magistrate Judge, (available at this link).

All parties do not consent to have a United States Magistrate Judge conduct any or all proceedings in this case.

## XI. Service by electronic means

Confirm that the parties consent to service of pleadings and discovery via email pursuant to Fed. R. Civ. P. 5(b)(2)(E). Any party that does not consent must explain its reasons.

Confirmed.

## XII.    Policies and procedures

Judge Murphy's policies and procedures are available for the parties to review on the Court's website. By signing below, counsel for each party and/or each pro se party represents that he or she has reviewed the Judge's policies and procedures and acknowledges the requirements contained therein. The parties and their counsel further acknowledge by signing below that Judge Murphy may strike pleadings and other submissions that do not comply with his policies and procedures.

## XIII.   Other matters

The Parties should identify any other issues that have not been addressed above but may require the Court's attention (e.g., anticipated motions, bifurcation, privilege issues, etc.).

None at this time.

15

Dated: October 20, 2025

| **O'HANLON SCHWARTZ, P.C.** | **MORGAN, LEWIS & BOCKIUS, LLP** |
|---|---|
| By: */s/ Noah A. Schwartz* | By: */s/ John V. Gorman* |
| Noah A. Schwartz (PA Bar No. 307835) | John V. Gorman (PA Bar No. 80631) |
| Israel A. Schwartz (Pa Bar No. 327623) | Bradie R. Williams (PA Bar No. 327334) |
| 1 Holtec Drive, Suite G102 | 2222 Market Street |
| Marlton, New Jersey 08053 | Philadelphia, Pennsylvania 19103 |
| 609.233.1590 | 215.963.5000 |
| Noah@ohanlonschwartz.com | john.gorman@morganlewis.com |
| Izzy@ohanlonschwartz.com | bradie.williams@morganlewis.com |
| *Attorneys for Defendant Orphion Therapeutics, Inc.* | *Attorneys for Plaintiff The Children's Hospital of Philadelphia* |